UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------X
ANDRES FERNANDEZ,

                             Plaintiff,                                     MEMORANDUM
                                                                         OPINION AND ORDER

                 -against-                                                           CV 06-3940 (ETB)

CENTRAL MINE EQUIPMENT COMPANY and
CENTRAL MINE EQUIPMENT COMPANY, INC.,

                             Defendants.
-----------------------------------------------------------------------X
CENTRAL MINE EQUIPMENT COMPANY and
CENTRAL MINE EQUIPMENT COMPANY, INC.,

                             Third-Party Plaintiffs,

                 -against-

WARREN GEORGE, INC.,

                             Third-Party Defendant.
-----------------------------------------------------------------------X

      Before the Court is the motion of the defendants, Central Mine Equipment Company and Central Mine Equipment Company, Inc. ("CME" or "defendants"), seeking the preclusion of plaintiff's expert, Clifford Anderson, as well as summary judgment, dismissing plaintiff's Complaint entirely. Plaintiff, Andres Fernandez ("plaintiff") opposes CME's motion. For the following reasons, CME's motion is granted in its entirety.

## FACTS[1]

This action arises out of injuries sustained by the plaintiff, Andres Fernandez, an employee of Warren George, Inc. ("Warren George"), on November 13, 2003, while he was assisting in soil penetration testing ("SPT") being conducted in Brooklyn, New York using a "CME 55" drilling rig manufactured by defendants (the "CME 55"). (Pl. R. 56.1 Statement ("Pl. 56.1") ¶ 1.)

The CME 55 is a SPT/geotechnical well-drilling unit that is mounted on a truck. (Pl. 56.1 ¶¶ 2, 27.) CME has been manufacturing the CME 55 since approximately 1961 and it is predominantly used in SPT and soil sampling projects. (Pl. 56.1 ¶ 27.) The CME 55 at issue herein was ordered by W.M. Walsh Company in May 1987 and built to specification. (Pl. 56.1 ¶ 29.) In May 2001, Warren George purchased the CME 55 at issue from W.M. Walsh Company for $70,000. (Pl. 56.1 ¶ 31.) CME was not involved in the resale of the CME 55 from W.M. Walsh Company to Warren George. (Pl. 56.1 ¶ 32.)

---

[1] The facts herein are taken from CME's Local Civil Rule 56.1 Statement, filed in support of their request for summary judgment. Plaintiff has not filed any counter-statement, as required under the local rules, therefore deeming all of the statements contained in CME's Rule 56.1 Statement admitted. See Loc. Civ. R. 56.1(c) (stating that "unless specifically controverted by a correspondingly numbered paragraph in the statement [of material facts] required to be served by the opposing party," the material facts set forth in the moving party's Rule 56.1 statement "will be deemed to be admitted for purposes of the [summary judgment] motion"); see also Giannullo v. City of New York, 322 F.3d 139, 140 (2d Cir. 2003) ("If the opposing party . . . fails to controvert a fact so set forth in the moving party's Rule 56.1 statement, that fact will be deemed admitted."); Layachi v. Minolta Bus. Sys., Inc., No. 00 Civ. 731, 2001 WL 1098008, at *1 (S.D.N.Y. Sept. 18, 2001) ("A [plaintiff's] Rule 56.1 statements are deemed admitted by [defendant] . . . when no opposition has been filed."). In fact, in plaintiff's counsel's affirmation in opposition to the within motion, plaintiff's attorney states that "Plaintiff adopts and incorporates herein the Statement of Undisputed Material Facts as set forth by defendant CME." (Mazzuchin Affirm. ¶ 3.) Accordingly, there do not appear to be any disputed issues of fact that necessitate a jury trial.

As manufactured, the CME is equipped with, among other things, a hydraulic hoist, a twenty-two foot mast and a manually operated cathead.[2] (Pl. 56.1 ¶ 2.) A cathead is a rotating steel drum around which rope is wrapped, with one end of the rope held by the drill operator and the other end extended over the top of the mast and attached to either pipes, drill bits, or hammers. (Pl. 56.1 ¶¶ 4, 34, 36.) As the drill operator pulls the rope, friction is created where the rope is wrapped around the rotating cathead, which aids the operator in lifting the items that are attached to the rope. (Pl. 56.1 ¶¶ 4, 35.) When the drill operator releases tension on the rope, the items attached to it are lowered. (Pl. 56.1 ¶ 4.) Although the cathead on the CME 55 can be used to hoist materials, its main purpose is to lift and drop a one-hundred and forty pound hammer in order to drive the standard penetration sample spoon to collect soil samples. (Pl. 56.1 ¶ 39.)

The CME 55 was originally equipped with two emergency kill switches that enable the drill operator to power down the drill rig engine electrically, which causes the cathead to stop rotating. (Pl. 56.1 ¶ 45.) One kill switch is located directly beneath the cathead and the other is located on the control panel. (Pl. 56.1 ¶ 46.) However, due to substantial post-sale modifications, both kill switches on the CME 55 at issue herein were removed. (Pl. 56.1 ¶ 64.)

On November 13, 2003, plaintiff, who was employed as a driller's helper with Warren George, was observing the drill operator, Greg Marney ("Marney"), lower an approximately sixty-foot string of drill rods into a hole using rope and the cathead.[3] (Pl. 56.1 ¶ 5.) As Marney

---

[2] Per W.M. Walsh Company's request, the CME 55 at issue herein was equipped with a conventional eight-inch diameter, manually operated cathead. (Pl. 56.1 ¶ 33.)

[3] The CME 55 was modified after it was sold to W.M. Walsh Company to allow pipe to exceed the height of the mast, thereby enabling the use of a sixty-foot drill rod string. (Pl. 56.1

lowered the drill rods, the drill bit at the bottom of the rods became caught on the inside groove on a piece of casing,[4] causing the rope being used to lower the rods to become slack and entangle on the cathead. (Pl. 56.1 ¶¶ 7, 131, 135.) Marney let go of the rope and the drill rods in the casing came out of the ground. (Pl. 56.1 ¶ 8.) Plaintiff attempted to grasp the drill rod string with his hands as it came out of the ground.[5] (Pl. 56.1 ¶¶ 9, 141.) Marney thereafter disengaged the clutch on the control panel of the CME 55 and plaintiff released his hold on the drill rods, allowing the drill rods to fall to the ground. (Pl. 56.1 ¶ 146.) However, the drill rod string did not fall straight down, but fell at an angle towards plaintiff, striking him in the foot and causing injury. (Pl. 56.1 ¶¶ 9, 149.)

Plaintiff commenced the within action in New York State Supreme Court, Kings County, on June 23, 2006, asserting claims for strict products liability, negligence and breach of warranty. (Sambursky Decl., Ex. A.) CME thereafter removed the action to this court on or about August 15, 2006.[6] (Sambursky Decl., Ex. B.) In support of his strict liability and negligence claims, plaintiff relies on the opinions of his expert witness, Clifford Anderson ("Anderson"), who posits that had the CME 55 been equipped with a "rope guide" or divider, the

---

¶¶ 6, 66-67.) This modification was in direct contravention to the instructions provided in the CME 55's Operator's Manual. (Pl. 56.1 ¶ 6.)

[4] A casing is a four-inch diameter pipe that is hammered into the ground and into which the drill rod string is inserted. (Pl. 56.1 ¶ 7.)

[5] This action on plaintiff's part was in direct contravention to the express warnings provided in the CME 55's Operator's Manual. (Pl. 56.1 ¶ 9.)

[6] On March 29, 2007, CME commenced a third-party action against plaintiff's employer, Warren George, who in turn asserted counterclaims against CME on or about May 23, 2007. (Sambursky Decl., Ex. D-E.) By stipulation dated August 1, 2008, CME and Warren George discontinued their claims against one another. (Sambursky Decl., Ex. G.)

cathead would not have become entangled, therefore preventing plaintiff's accident from occurring. (Pl. 56.1 ¶ 165; Sambursky Decl., Ex. H.) CME now moves for summary judgment on the grounds that Anderson is not qualified to testify regarding the matters at issue in the instant litigation and accordingly, should be precluded from doing so. CME therefore urges the court to disregard Anderson's testimony in deciding its summary judgment motion, arguing that it is entitled to summary judgment on the grounds that plaintiff cannot establish a prima facie case of strict products liability or negligence without the aid of expert testimony.

## DISCUSSION

I.  Legal Standard for Admitting Expert Testimony

Expert testimony must be evaluated in accordance with Federal Rule of Evidence 702, which states:

> If scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Rule 702 imposes a two-fold analysis on the trial court. First, the court must "make an initial determination as to whether the proposed witness qualifies as an expert." Baker v. Urban Outfitters, Inc., 254 F. Supp. 2d 346, 352 (S.D.N.Y. 2003). If the court is satisfied that the proposed witness does indeed qualify as an expert, then the court "must inquire into whether the scientific, technical or other specialized testimony provided by that expert is both relevant and reliable." Id. at 352-53 (citing Kumho Tire Co. v. Carmichael, 526 U.S. 137, 152 (1999)).

The burden of establishing the admissibility of the proffered expert testimony weighs on the proponent of that testimony. See Baker, 254 F. Supp. 2d at 353. "Though the weight given to expert testimony should be left to the finder of fact, expert testimony should be excluded altogether if it is 'speculative' or 'conjectural' or if it is based on assumptions 'so unrealistic and contradictory as to suggest bad faith.'" Id. (quoting Boucher v. U.S. Suzuki Motor Corp., 73 F.3d 18, 21 (2d Cir. 1996)). Moreover, courts are not required to admit expert opinion evidence that is "connected to existing data only by the ipse dixit of the expert . . . A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." General Elec. Co. v. Joiner, 522 U.S. 136, 146 (1997).

II.     Admission of Anderson's Expert Testimony

CME argues that Anderson does not possess the requisite knowledge and experience to be qualified as an expert in the present case, and that, even if he were qualified, his testimony is unreliable and should be precluded. Accordingly, CME asserts that the court should disregard Anderson's testimony in deciding its summary judgment motion. See, e.g., Cacciola v. Selco Balers, Inc., 127 F. Supp. 2d 175, 180 (E.D.N.Y. 2001) (stating that where expert testimony is excluded as inadmissible under Federal Rule of Evidence 702, "the summary judgment determination is made on a record that does not include that evidence").

1.      Anderson's Qualifications

According to Anderson's curriculum vitae, he possesses both bachelor's and master's degrees in mechanical engineering and is a licensed professional engineer in the state of New Jersey. (Sambursky Decl., Ex. H; Anderson Dep. 51.) Anderson is currently employed as

an engineer with Robson Forensics and has been since 1996, specializing in mechanical engineering, accident reconstruction and industrial accidents. (Anderson Dep. 18-20; Sambursky Decl., Ex. H.) Prior to joining Robson Forensics, Anderson taught courses in engineering and vector mechanics, owned his own consulting firm that specialized in the "[e]valuation, troubleshooting, and design of machinery," was a pipe stress engineer for nuclear power piping, a project engineer for an entity that designed and produced automobile brakes and clutches, and was also an automobile mechanic. (Sambursky Decl., Ex. H.)

Anderson conceded at his deposition that he has "very little" experience in the fields of geotechnical or water well drilling. (Anderson Dep. 164-65.) Indeed, his only experience comes from observing other individuals who were drilling in the backyard of his home, to whom he asked "engineering directed questions." (Anderson Dep. 165.) Anderson has never operated a manually operated cathead on a geotechnical or water well drilling rig, such as the CME 55 at issue herein.[7] (Anderson Dep. 97.) Nor has he ever designed a geotechnical or water well drilling rig, or any of the components that make up such rigs. (Anderson Dep. 99.) Anderson has similarly never designed or assisted in the design of any product that contains a manually operated cathead. (Anderson Dep. 100.)

Anderson also conceded at his deposition that he has never been retained as a consultant by a geotechnical drilling company. (Anderson Dep. 165.) Nor has he ever been retained to provide any type of expertise on the means and methods used by geotechnical or water well drillers. (Anderson Dep. 165-66.) Anderson further testified that he does not hold himself out as

---

[7] Nor has Anderson ever operated a cathead on either a crane or an oil drilling rig. (Anderson Dep. 97-98.)

an expert in geotechnical or water well drilling or the equipment used in such processes. (Anderson Dep. 166.)

Finally, Anderson has never been qualified as an expert in a court proceeding in the state of New York. (Anderson Dep. 52.) Moreover, Anderson admitted that he has previously been disqualified as an expert on five separate occasions, either because he was not qualified in the specific field on which he sought to opine or because his opinions could not be substantiated. (Anderson Dep. 53-54; see, e.g., Simmons v. Ford Motor Co., 132 Fed. Appx. 950, 2005 WL 1274662, at *1 (3d Cir. May 31, 2005).)

Based on the foregoing, Anderson lacks the requisite qualifications to testify as an expert in this action. In a recent case involving expert testimony with respect to a laundry pressing machine, and where the proposed expert similarly lacked any qualifications with respect to the field of expertise at issue, the court precluded the expert's testimony, finding that since the expert had never designed a machine of any kind and had never worked with laundry machines in any capacity "that bears on the conclusions he reaches in this case," he "lack[ed] the requisite qualifications and knowledge authorizing him to testify as an expert witness." Barban v. Rheem Textile Sys., Inc., No. 01-CV-8475, 2005 WL 387660, at *4 (E.D.N.Y. Feb. 11, 2005), aff'd, 147 Fed. Appx. 222 (2d Cir. 2005). The court went on to hold that the expert's "lack of relevant experience and qualifications plainly conveys 'that whatever opinion he will ultimately express as to the cause of Plaintiff's accident 'would be imaginatively speculative.'" Id. (quoting Mannix v. Chrysler Corp., No. 97-CV-1944, 2001 WL 477291, at *1 (E.D.N.Y. Mar. 4, 2001) (precluding proposed expert testimony on summary judgment motion)). The same can be said for Anderson. See Trumps v. Toastmaster, Inc., 969 F. Supp. 247, 251-52 (S.D.N.Y. 1997)

(holding that the proffered expert, a mechanical engineer, was not qualified to express an opinion on electrical engineering, the subject at issue); Rosen v. Tanning Loft, 791 N.Y.S.2d 641, 643 (App. Div. 2005) (holding that plaintiff's expert was not qualified to testify because although he was an engineer, he had "no specialized knowledge, experience or training with regard to tanning equipment so as to qualify him as an expert in the area"); Hong v. County of Nassau, 527 N.Y.S.2d 66, 66 (App. Div. 1998) (affirming trial court's decision to exclude expert testimony where witness was a mechanical engineer but did not have any specialized knowledge with regard to the design or development of golf courses or any type of recreational area).

Plaintiff asserts that although Anderson is not an expert with respect to the means and methods of geotechnical well drilling, he is a mechanical engineer with expertise in accident reconstruction and industrial accidents, which qualifies him to opine about plaintiff's accident. (Mazzuchin Affirm. ¶¶ 6-8.) In support of this argument, plaintiff points to a recent case within this district, Nisanov v. Black & Decker (U.S.) Inc., No. 05 Civ. 5911, 2008 WL 906708, at *1 (E.D.N.Y. Apr. 3, 2008), in which the court stated that it "need not preclude an expert from testifying merely because he or she does not possess experience tailored to the precise product or process that is the subject matter of the dispute." Id. at *3 (citing cases). However, plaintiff overlooks the next statement in Nisanov that "the expert must have relevant experience and qualifications such that whatever opinion he or she will ultimately express would not necessarily be speculative." Id. (citing cases). This is where Anderson's qualifications fail.

Although Anderson is a licensed mechanical engineer, his work experience contains little to no involvement in the drilling industry. Nothing in his resume or his deposition testimony permits this Court to conclude that Anderson has any relevant experience in the field of

geotechnical or water well drilling or with a manually operated cathead, such as the one at issue in this litigation. "The important point [in rendering an expert qualified to testify] is that the mechanism at issue has sufficient similarities to those with which the expert has experience so that the expert's experience is relevant." Id. at *5. Plaintiff has offered nothing from which the Court may conclude that Anderson's prior experience is relevant to the issues involved herein. Accordingly, any opinion that Anderson would offer would be based on nothing more than improper speculation.

As plaintiff points out, the district court has broad discretion in deciding whether an expert is qualified to offer an opinion. See id. at *2 (citing Stagl v. Delta Air Lines, Inc., 117 F.3d 76 (2d Cir. 1997). In keeping with that directive, the Second Circuit has held that "[i]n some circumstances . . . a district court may properly conclude that witnesses are insufficiently qualified despite the relevance of their testimony because their expertise is too general or too deficient." Stagl, 117 F.3d at 81. That is the case here.

2. Anderson's Testimony is Unreliable and Speculative

Even assuming arguendo that Anderson did possess the requisite qualifications necessary to render an expert opinion in this case, a review of his proffered testimony reveals that his opinions are unreliable and speculative and, as such, inadmissible.

As explained by the Supreme Court in Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579 (1993) and Kumho Tire Co. v. Carmichael, 526 U.S. 137 (1999), there are several factors that a court may consider, in addition to those enunciated in Federal Rule of Evidence 702, when determining whether expert testimony is both relevant and reliable. Such factors include:

> (1) whether a theory or technique has been or can be tested;
> (2) whether the theory or technique has been subjected to peer review and publication; (3) the technique's known or potential rate of error and the existence and maintenance of standards controlling the technique's operation; and (4) whether a particular technique or theory has gained general acceptance in the relevant scientific community.

Wills v. Amerada Hess Corp., 379 F.3d 32, 48 (2d Cir. 2004) (quoting Daubert, 509 U.S. at 593-94) (internal quotation marks omitted).

In the instant case, Anderson testified that he never inspected the CME 55 prior to issuing his expert report. (Anderson Dep. 110-11.) Rather, Anderson issued his report on February 15, 2006 - more than eighteen months before inspecting the CME 55.[8] (Anderson Dep. 71.) Nor did Anderson review the CME 55's Operator's Manual prior to issuing his report, rendering it "unnecessary" for his opinions. (Anderson Dep. 73.) Anderson similarly did not request that he be provided with the technical specifications for the CME 55, instead opting to acquire "some of the technical specifications off the web site," and determining that to be enough for him to render his opinions. (Anderson Dep. 74.) Anderson also testified that he was not aware how the CME 55 was originally manufactured, having issued his opinions without ever consulting its build sheet. (Anderson Dep. 74-75.) In fact, Anderson was completely unaware that any modifications had been made to the CME 55 at issue herein until he read the defendants' expert report immediately before being deposed. (Anderson 10, 76, 110.)

Anderson also testified that the only person he spoke to before issuing his opinions was Al Schoen, a former colleague who performed the statutory research for Anderson's expert

---

[8] Anderson did not modify his report in any way after his inspection of the CME 55. (Anderson Dep. 71.)

-11-

report. (Anderson Dep. 25, 30, 102.) Anderson did not speak with Marney, the drill operator, plaintiff or anyone from CME prior to issuing his expert report. (Anderson Dep. 105.) Nor did Anderson consult with any person or company that manufactures geotechnical or water well drilling equipment concerning the use of manually operated catheads. (Anderson Dep. 105.) The only documents that Anderson reviewed in connection with his expert report were the plaintiff's deposition transcript, Marney's witness interview and fifteen color photographs of the CME 55.[9] (Anderson Dep. 106.) In fact, Anderson's knowledge as to the purpose and functions of the CME 55 was derived solely from literature he found on the internet. (Anderson Dep. 118.)

During his deposition, Anderson testified that he was unaware who the original purchaser of the CME 55 was. (Anderson Dep. 128.) Anderson was similarly unaware of when the CME 55 at issue was manufactured, when it was originally sold and how many people owned it prior to Warren George. (Anderson Dep. 128.) In addition, Anderson was unaware of whether any modifications were made to the CME 55 by Warren George or its previous owner. (Anderson Dep. 110, 128.) Nor was Anderson aware of how many hours of service the CME 55 or its cathead had been in use prior to plaintiff's accident or whether any maintenance had been performed on the CME 55 prior to plaintiff's accident. (Anderson Dep. 138-39.)

Moreover, Anderson did not know how many speeds the cathead had, whether the CME 55 was manufactured with one or more kill switches or whether any of the kill switches had been

---

[9] Anderson testified that he also reviewed research from the internet but he could not specifically delineate what this research consisted of other than "various descriptions" of "exemplar catheads" and standards with respect to the operation of drill rigs. (Anderson Dep. 107-10.)

removed prior to plaintiff's accident. (Anderson Dep. 140, 142-43.) Anderson also did not know whether the rope wrapped around the cathead at the time of his inspection of the CME 55 was the same diameter of the rope at the time of plaintiff's accident, how the rope was wrapped around the cathead, or the length, age or condition of the rope. (Anderson Dep. 110, 140-41, 143.) Anderson also did not know whether the CME 55 contained any warnings when originally manufactured or whether any warnings had been removed from it. (Anderson Dep. 146, 187.) Nor did Anderson take into account CME's instructions regarding how high materials should be lifted above the CME 55's mast in rendering his opinions. (Anderson Dep. 159.) Finally, Anderson did not know if anyone had ever been injured using a CME 55 rig as a result of the manually operated cathead prior to plaintiff's accident. (Anderson Dep. 128, 171-72.)

When questioned at his deposition about plaintiff's accident, Anderson did not know how far behind the truck Marney was standing when operating the cathead or where in relation to the cathead Marney was standing. (Anderson Dep. 174-75.) Anderson also did not know whether Marney was operating the cathead with both hands or one and whether he was using his right or left hand. (Anderson Dep. 175.) Anderson was further unaware of where Marney was looking at the time of plaintiff's accident or of how many wraps of rope were around the cathead at that time. (Anderson Dep. 175, 204.) Anderson similarly did not know the diameter of the casing into which plaintiff was guiding the drill rod or the weight and diameter of the drill rod itself. (Anderson Dep. 176-77.) Nor did Anderson know how much force Marney was applying to the rope immediately before plaintiff's accident or the speed at which the cathead was rotating. (Anderson Dep. 187, 190.)

Despite his apparent dearth of knowledge, Anderson nevertheless opines that had devices

to prevent overlapping of the wraps of rope - i.e., a rope guide and divider - been incorporated into the design of the cathead, plaintiff's accident would not have happened. (Sambursky Decl., Ex. H.) However, Anderson conceded at his deposition that he has never seen or operated a cathead with a rope guide and divider such as he proposes. (Anderson Dep. 88-89, 101-02, 136-37, 168.) Nor has Anderson designed a rope guide and divider for use on a manually operated cathead. (Anderson Dep. 100, 169, 201-03.) Moreover, Anderson has not conducted any study or hazard analysis - or hired anyone to do so - as to whether installing a rope guide and divider would indeed provide a safer alternative.[10] (Anderson Dep. 138, 166, 169.) Anderson has similarly not performed any cost analysis with respect to the modification he proposes. (Anderson Dep. 169.) In fact, Anderson admitted at his deposition that he has not tested any of the theories contained in the opinions he rendered. (Anderson Dep. 112, 169, 202.) "[Testing] is the touchstone of what an engineering expert in a design defect case should do." Barban, 2005 WL 387660, at *5 (citing Kass v. West Bend Co., 2004 WL 2475606, at *6 (E.D.N.Y. Nov. 4, 2004) ("[c]ourts have repeatedly rejected expert testimony where a proposed theory or alternative design was not properly tested for safety or utility"); see also Brooks v. Outboard Marine Corp., 234 F.3d 89, 92 (2d Cir. 2000) ("The failure to test a theory of causation can justify a trial court's exclusion of the expert's testimony."). Anderson's failure to test his proposed alternative, namely placing a rope guard and divider on the manually operated cathead at issue to determine whether it would indeed provide a safer alternative and whether it would even be feasible so as not to impact the utility of the machine, leads to the conclusion that his

---

[10] Anderson testified that he did not conduct a "formal" hazard analysis, but rather, engaged in a "mental exercise" by which he evaluated the safety hazards of a rope guide and divider. (Anderson Dep. 166-67.)

opinion is based on nothing more than speculation.

Based on the foregoing, the Court finds that the opinions that Anderson expresses rest on "unsubstantiated generalizations, speculative hypotheses and subjective evaluation that are based neither upon any professional study or experience-based observation." Cacciola, 127 F. Supp. 2d at 183 (granting motion to preclude expert testimony). As expressed by the Supreme Court in Daubert, the trial court functions as a "gatekeeper" with respect to the admission of expert testimony. See generally Daubert, 509 U.S. 579. In that function, the trial court must exclude testimony that "rest[s] unreliably on a foundation of sand." Cacciola, 127 F. Supp. 2d at 184. Accordingly, CME's motion to exclude Anderson's testimony is granted.

III.   Legal Standard for Summary Judgment

Summary judgment is appropriate when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The burden is on the moving party to establish the lack of any factual issues. See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). The very language of this standard reveals that an otherwise properly supported motion for summary judgment will not be defeated because of the mere existence of some alleged factual dispute between the parties. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986). Rather, the requirement is that there be no "genuine issue of material fact." Id. at 248.

The inferences to be drawn from the underlying facts are to be viewed in the light most favorable to the non-moving party. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475

U.S. 574, 588 (1986). When the moving party has carried its burden, the party opposing summary judgment must do more than simply show that "there is some metaphysical doubt as to the material facts." Id. at 586. Under Rule 56(e), the party opposing the motion "may not rest upon the mere allegations or denials of his pleadings, but . . . must set forth specific facts showing there is a genuine issue for trial." Anderson, 477 U.S. at 248.

When considering a motion for summary judgment, the district court "must also be 'mindful of the underlying standards and burdens of proof' . . . because the evidentiary burdens that the respective parties will bear at trial guide district courts in their determination of summary judgment motions." SEC v. Meltzer, 440 F. Supp. 2d 179, 187 (E.D.N.Y. 2006) (quoting Brady v. Town of Colchester, 863 F.2d 205, 211 (2d Cir. 1988)) (internal citations omitted). "Where the non-moving party would bear the ultimate burden of proof on an issue at trial, the burden on the moving party is satisfied if he can point to an absence of evidence to support an essential element of the non-movant's claim." Meltzer, 440 F. Supp. 2d at 187.

### A. Plaintiff's Strict Liability and Negligence Claims

In order to prevail on his claims of strict products liability and negligence, plaintiff must demonstrate evidence of a defect in the design of the product at issue. See Voss v. Black & Decker Mfg. Co., 59 N.Y.2d 102, 106-07 (1983) (citations omitted). Having ruled that plaintiff's proposed expert testimony is inadmissible, plaintiff "has no evidence to support his claim[s] that amounts to [any]thing more than that he was injured" while using the CME 55 manufactured by defendants. Mannix v. Chrysler Corp., No. 97-CV-1944, 2001 WL 477291, at *5 (E.D.N.Y. Mar. 4, 2001); see also Brooks, 234 F.3d at 92 (finding summary judgment proper where plaintiff's expert was excluded and thus plaintiff had no evidence in the record to support

a claim for design defect); Trumps, 969 F. Supp. at 254 ("It follows from the exclusion of [plaintiff's expert's] opinion evidence that [defendant's] motion for summary judgment must be granted."). Accordingly, plaintiff's claims for strict products liability and negligence fail as a matter of law and summary judgment is granted to CME on those claims.

B.     Plaintiff's Breach of Warranty Claim

As a threshold matter, as CME correctly points out, plaintiff's opposition to the instant motion fails to address his breach of warranty claim in any way, let alone offer any evidence as to why CME should not be awarded summary judgment on this claim. As a result, the claim is deemed abandoned.[11] See Ostroski v. Town of Southold, 443 F. Supp. 2d 325, 340 (E.D.N.Y. 2006) ("Because plaintiff's opposition papers did not address defendant's motion for summary judgment on [plaintiff's abuse of process] claim, the claim is deemed abandoned and summary judgment should be granted on that basis alone."); Taylor v. City of New York, 269 F. Supp. 2d 68, 75 (E.D.N.Y. 2003) ("Federal courts may deem a claim abandoned when a party moves for summary judgment on one ground and the party opposing summary judgment fails to address the argument in any way."). However, even if the Court were to overlook plaintiff's obvious abandonment, the breach of warranty claim fails as a matter of law, as discussed below.

Section 2-725 of the New York Uniform Commercial Code ("UCC") mandates that breach of warranty claims must be brought within four years from the time the cause of action accrues. See N.Y. U.C.C. § 2-725; see also Doss, Inc. v. Christie's, Inc., No.08 Civ. 10577,

---

[11] The same result occurs with plaintiff's claims for a manufacturing defect, failure to warn and a violation of the Occupational Health and Safety Act and Drilling Industry Article 42 § 6642, which are not pleaded in plaintiff's Complaint but apparently alleged in answers to CME's request for interrogatories. (Sambursky Decl., Ex. Z

2009 U.S. Dist. LEXIS 88882, at * 8 (S.D.N.Y. Sept. 22, 2009); Orlando v. Novurania of Am., Inc., 162 F. Supp. 2d 220, 223 (S.D.N.Y. 2001). A cause of action accrues for purposes of a breach of warranty claim "upon delivery of the product to the initial purchaser." Delehanty v. KLI, Inc., No. 07-CV-2047, 2009 U.S. Dist. LEXIS 91144, at * 16 (E.D.N.Y. Sept. 30, 2009) (citing Solorio v. Asplundh Tree Expert Co., No. 02-CV-8035, 2009 U.S. Dist. LEXIS 23354, 2009 WL 755362, at *5 (S.D.N.Y. Mar. 23, 2009)) (additional citation omitted); Saladino v. Stewart & Stevenson Servs., Inc., No. 01-CV-7644, 2007 U.S. Dist. LEXIS 88644, at *37 (E.D.N.Y. Nov. 30, 2007) ("New York law is clear that breach of warranty claims accrue when the manufacturer tenders delivery of the product to the initial purchaser.").

Here, it is undisputed that the CME 55 was sold to its original purchaser, W.M. Walsh Company, in 1987. (Def. 56.1 ¶ 29; Sambursky Decl., Ex. Q.) Based on the UCC provision and the foregoing case law, the four-year statute of limitations began to run at that time, expiring in 1991 - more than fifteen years before plaintiff filed the within action. Accordingly, plaintiff's claim for breach of warranty is time-barred and defendants are awarded summary judgment with respect to that claim.

## CONCLUSION

For the foregoing reasons, defendants' motion for summary judgment is granted and plaintiff's Complaint is dismissed in its entirety.

The Clerk of the Court is directed to enter judgment accordingly and to mark this case closed.

**SO ORDERED:**

Dated: Central Islip, New York
November 23, 2009

                                                               /s/ E. Thomas Boyle
                                                               E. THOMAS BOYLE
                                                               United States Magistrate Judge